On the Merits.
On the 7th of November, 1893, the plaintiff commenced proceedings by attachment, which was subsequently dissolved by the Judge of the District Court, because of certain supposed irregularities in the proceedings; but on appeal to this court that judgment was set aside, the attachment reinstated and the cause remanded for further-proceedings.
Since the cause was remanded it was tried by a jury, who ren - dered a verdict in favor of the defendant for seven thousand five hundred and eighty-four dollars as actual damages sustained in the wrongful issuance of the writ, and they at the same time gave judgment in favor of the plaintiff for the sum of two thousand seven hundred and fifty-six dollars and twenty-three cents, thus giving the defendant judgment for a'n approximate balance of four thousand' eight hundred and twenty-eight dollars and eleven cents over the-amount given to the plaintiff.
From that judgment the plaintiff has appealed.
For a succinct statement of the case see case of same title, 47 An. 710.
Suit is brought on an open account for about the sum of two-thousand nine hundred dollars, for cash advanced to the defendant* *1327 and, as a collateral security for which, the defendant executed his promissory note for two thousand five hundred dollars, payable at a future date, and secured same by special mortgage.
The attachment proceeds upon the theory that the defendant had mortgaged, assigned or disposed of, or was about to mortgage, assign or dispose of his property, or some part thereof, with intent to defraud his creditors. The defendant having, in his motion to dissolve the attachment on technical grounds, reserved the right to have the attachment dissolved, in the alternative, because the affidavit was untrue, availed himself of that reservation when the cause was remanded, and, in his answer, set up the untruthfulness of the affidavit and claimed in a reconventional demand nine thousand three hundred ond eighty-four dollars and forty cents actual damages, in addition to about four hundred dollars in the way of credits for partial payments made on account.
The two questions for consideration are: (1) Was the affidavit ' untrue when made? (2) If untrue in point of fact, to what amount has defendant been damaged?
In determining the truthfulness of plaintiff’s affidavit, the main, question is whether the defendant was guilty of fraud, either intended or accomplished, in the acts complained of as justifying a-resort to the writ.
The record shows that on the 25th of April, 1893, the defendant-executed his obligation in favor of the plaintiff, for and in consideration of an advance of two thousand five hundred dollars to be made-by it, on his drafts aggregating five hundred dollars per month,, binding himself to ship to the company “ during the season of 1893-94, four hundred tons, and as much more of good sound cotton seed,, as he ceuld buy or control, this seed to be weighed at Lake Providence by clerk of steamboat, and credited to (him) at the market-price,” etc.
Defendant’s contract further stipulates that “as security for the-payment of this advance and the delivery ” of cotton, he was to execute an act of mortgage on his ginhouse and contents, in the sum of two thousand five hundred dollars; and, in accordance with that contract, he did execute his note and mortgage for the sum of two-thousand five hundred dollars, “ for money advanced and to be advanced duiing the year 1893.”
Plaintiff’s account shows that an account was opened with the de *1328 fendant by the payment of his draft for two hundred and fifty-nine dollars and forty-three cents, on the 1st of May, 1893; and that the cash advances were regularly continued, by the payment of similar drafts at similar dates, and of various amounts — the total amount aggregating two thousand nine hundred and eleven dollars and ninety-eight cents on the 25th of October, 1893, when the account was closed, and far in excess of the original amount agreed on.
It thus appears that the plaintiff fulfilled to the letter the terms of its contract, and even honored defendant’s drafts beyond the amount agreed upon, notwithstanding there occurred in the summer of 1893 a great crevasse on the banks of the Mississippi river, in the immediate vicinity of Lake Providence, where the defendant lived, and where his purchases of cotton seed were tobe made for the discharge of his contract, thus rendering performance difficult.
It also appears that in view of this situation, the plaintiff sent a representative to the defendant with the definite object of procuring the latter’s consent to a cancellation of the agreement, upon his shipping enough seed to cover the amount then due; but this proposition the defendant declined — insisting on the continuance of advances.
Realizing that defendant was drawing long after cotton had commenced to open, and cotton seed was deliverable, under his contract, without any shipment having been made, plaintiff wired him to know upon what he predicated his drafts; and to this he made reply, “against cotton seed stored away in ginhouse.” A witness for the plaintiff makes this statement on that subject, viz.:
“ I was sent by the company to see (the defendant) because he telegraphed the company that certain drafts he was drawing, and for which he had no authority to draw (were drawn) against seed he had in his warehouse, as the company advanced him the full amount they agreed (to furnish), as per contract. I was instructed by the company to say that they would not pay the draft in question, but if he would ship cotton to cover drafts, and ship the seed he had on hand, they would help him further.”
He further states, that he was directed to ascertain “why he was holding the seed, when it was understood he was to ship as the seed reached him from time to time during the season;” but the defendant “ declined to give (him) any satisfactory information of what he intended doing.”
*1329 That he made a demand upon him to comply with his contract “ (and) ship the seed on hand (and) he refused, giving as his reason that it would occasion him an extra expense to haul the seed to the landing.”
That defendant claimed to have on hand at the time about four - teen hundred sacks. That he examined them as best he could, but they were stored in such indifferent order he could not count them. That he requested defendant to allow him to examine his books, and he declined on the ground that they were not posted. That he proposed that he and defendant post the books, but this proposition was declined. That he then requested the defendant to allow him to see his gin book, so that he could estimate the quantity of seed he should have on hand, and that request was refused. The witness then stated that, from the appearance of what he saw, he supposed there were about a thousand sacks.
That the defendant said “ he would ship (plaintiff) the seed when the boats could reach his warehouse, provided we continued to pay his drafts; but if these drafts were not honored and should be returned to him he would make them good by disposing of the seed on hand.” That he “called his attention to the agreement and (the fact) that the company had more than fulfilled its part, and insisted on his shipping the seed on hand and stop talking about drafts he had no authority to draw.”
That the defendant replied “ that if the drafts were returned unhonored he would protect his friends from whom he had purchased the seed by. selling sufficient seed to cover the drafts returned.”
That he asked defendant for a bill of sale for the cotton seed on hand, and he had refused. Thathe requested of him an explanation of the expenditure of the money advanced by the plaintiff to him and to secure his agreements for the purchase of seed,” and he gave none.
The witness states that on a previous occasion he visited the defendant with reference to the crevasse and urged him to ship seed to cover the balance then due and call the contract off; that he positively declined to do so, stating that “ he could fulfil his part of the agreement notwithstanding the crevasse; that he was not held to Providence alone, and that he had funds at other points and could secure more seed than he had agreed to ship.”
Being dissatisfied with the result of his interview, the witness made *1330 a formal written protest and delivered it to the defendant in person and placed the matter in the hands of an attorney and the attachment followed a few days afterward; the-attorney having, in the meanwhile, interviewed the defendant and learned from him that he was engaged in preparing his seed for sale, and “was waiting for the seed boat of the Union Oil Company, which he expected down (the river) the following day;” also that plaintiff had quit paying his drafts and that was the reason he was going to sell his seed to the Union Oil Company.
On the contrary, the defendant, as a witness, denies that it was nis intention to sell the seed to the Union Oil Company, but states that he expected to submit to the captain of the steamboat which was operating for that company a proposition in respect to the seed. That “he was simply repiling the seed so that (he) could see what he had and be able to show what he had.” That he told Mr. Wyiy, the attorney of the plaintiff, that he felt satisfied that (he) could make arrangements to pay the Standard Oil Company what he owed them and go ahead in the.business for another company.”
While the defendant claims that he had on hand at the time eighty tons of seed, yet the sheriff’s return discloses that only about seventy tons were taken under the writ of attachment, and the value of same was only six hundred and twenty-two dollars and ninety-five cents.
Defendant’s counsel point out the fact, that at the time of the attachment his mortgage note had not become due, and did not become due until the 31st of December, 1893; and that, consequently, plaintiff was well secured, and the stipulation of the contract was that defendaut should ship the seed during the season of 1393-94, which had only been open for a short time, and was at the time of seizure practically suspended.
This explanation is, to our minds, unsatisfactory. The plaintiff’s suit is upon account, as the primary evidence of the defendant’s indebtedness. The note and mortgage were only collateral security therefor. The company was engaged in the business of compressing oil from cotton seed. The contract with the defendant was entered into for the specific object of obtaining cotton seed for the purposes of their business. For that purpose they had agreed to advance money to the defendant to enable him to purchase seed and ship same to them. When purchased and stored the seed constituted a quasi pledge for the defendant’s indebtedness; and he had procured *1331 the advances of money with the specific promise in writing to ship same to plaintiff. The plaintiff’s money had been presumably invested in the seed, and it had a right to rely upon them as security for the reimbursement of their outlay.
Looking at the result of the enterprise, the plaintiffs were in the attitude of having advanced two thousand and nine hundred dollars in cash, and received nothing in return; and that of the defendant was of having received that sum, and having on hand at date of seizure only six hundred dollars’ worth of seed.
In the light of these facts, the defendant’s response to the plaintiff’s telegram making inquiry as to what he predicated his drafts upon, wants confirmation; and these facts place the defendant in the equivocal attitude of having either misstated the facts in his answer, or of having disposed of a large part of the seed in the interim between the statement and the seizure. But be that as it may, the defendant declined to make any satisfactory arrangement of the matter with the plaintiff’s agent or attorney, notwithstanding he was pressed and importuned to do so. On the contrary, he distinctly stated to them that he did not intend to pay the plaintiff anything or ship it any seed, unless it continued to pay his drafts— notwithstanding he had largely overdrawn his contract at the time.
It is quite true that the defendant did ship to the plaintiff some bales of cotton, the proceeds whereof so diminished his account as to leave only the sum of one hundred and eighty-eight dollars and thirty-three cents in excess of his two thousand five hundred dollar note; but that shipment was subsequent to the attachment, and exercises no bearing on the question of fraud. That can be viewed only in the light of an afterthought; and it is also significant that just prior to this shipment, the defendant drew on plaintiff several other drafts.
It must be borne in mind, that at the time of the interview that plaintiff’s agent had with the defendant, which is declared in the testimony supra, it is clearly shown that the Mississippi river was navigable at Lake Providence, as the steamboat belonging to the Union Oil Company was due and expected on the following day, and defendant expected to make a deal with her captain in respect to the seed which were subsequently attached.
We are of opinion that the views we expressed in the ease of Shingle and Lumber Company vs. Lorio, 46 An. 441, are strictly applicable and should govern this case.
*1332 In that case we said:
“Plaintiffs have, on the other hand, up to date paid out the money and advanced the supplies mentioned, and not only have not received anything by way of return, but are confronted with a large-claim for damages.
“We have examined the record with great care to see whether this unequal condition of affairs was brought about by the conduct of the plaintiffs themselves. * * * It suffices to say that, in our opinion, defendant’s complaints are not only without merit, but, on the contrary, his course has been unjustifiable and his demand unreasonable.
“ There is nothing in the contract to warrant defendant in the-pretension that the plaintiffs were to continue to furnish him with money and supplies,” etc.
It is conceded, that, in order to justify a resort to an attachment-under. the statute relied upon, it is a condition precedent that the defendant must have been guilty of fraud in the sale, or attempted alienation of his property, to the prejudice of his creditors; but we think the facts we have related clearly evidence such a fraudulent intent within the meaning of that statute, and that the plaintiff was entitled to resort to the remedy by attachment.
Entertaining these views, the judgment appealed from must be so-amended as to conform thereto.
It is therefore ordered and decreed that the judgment appealed from be so amended as to reject and disallow the defendant’s demands in toto, except as to the credit he is allowed for the proceeds of cotton delivered to the plaintiff.
It is further ordered and decreed that the judgment dissolving plaintiff’s attachment be set aside, the writ of attachment and the seizure under it be revived, and, as revived, that same be maintained and enforced on the property attached, and that the privilege of plaintiff as attaching creditor be recognized and enforced upon the property attached. »
It is finally ordered and decreed that the judgment be, in all other respects, affirmed, and that the defendant be taxed with the costs of both courts.